AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

MAY - 1 2025

MITCHELL R. ELFERS
CLERK OF COURT

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Residence at 1490 1/2 6th Street, Las Cruces, NM   and
the Person of Timothy Thomas Wilson

)
)
)
)
)
)

Case No. 25MR824

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and fully incorporated herein.

located in the ___Dona Ana County___ District of ___New Mexico___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Possession with the intent to distribute a controlled substance |
| 21 USC 846 | Conspiracy to distribute a controlled substance |
| 18 USC 924(c) | Possession of a firearm in furtherance of drug trafficking |
| 18 USC 922(g) | Possession of a firearm and/or ammunition by a prohibited person |

The application is based on these facts:

See Attachment C, which is attached and fully incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Mosley, FBI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephonically sworn and electronically submitted__ *(specify reliable electronic means).*

Date: ___May 1, 2025___

_____
*Judge's signature*

City and state: ___Las Cruces, New Mexico___

GREGORY B. WORMUTH, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Description of Location and Person to be Searched

The premises to be searched is brown, 5th wheel camper identified as "Kodiak" located at 1490 1/2 6th Street, Las Cruces, New Mexico ("NM"). It is a secured lot that has been observed with multiple vehicles, storage containers and U.T.Vs. The secured lot has a dirt driveway from 6th street that leads up to a chain link fence gate with the chain link around the property on the Westend. The camper has pop outs with colored designs on it with the camper door facing East towards a red cargo container (photographed below). The person to be searched is Timothy Thomas Wilson (photographed below).

The search of the above the Subject Premises shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the Subject Premises, and all vehicles and persons located on the Subject Premises in or on which the items to be seized could be concealed.

Biometric Access to Devices: During the execution of the search of the Subject Premises described herein, law enforcement officers are also specifically authorized to compel Timothy Thomas Wilson to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

    1. Any devices found at the Subject Premises.

    2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the

purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant. This warrant does not authorize law enforcement personnel to compel any other individuals found at the Subject Premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device(s).



STATUS: VALID



Timothy Thomas Wilson AKA "Timbo"

DOB: 4-24-90

Height: 5'6

Weight: 178lbs

## ATTACHMENT B

### Property to be seized

All records, information, and evidence relating to violations of 21 U.S.C. §§ 841 and 846, 18 U.S.C. § 922(g), and 18 U.S.C. § 924(c) involving Timothy Thomas Wilson, including:

1.    Controlled substances, including, but not limited to, methamphetamine, heroin, cocaine, and marijuana.

2.    Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3.    Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4.    Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5.    Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6.    Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7.    Messages, notes, correspondence, and/or communications between drug trafficking associates.

8.    Indications of ownership or control of the Subject Premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9.    Indications of ownership or control over any vehicles located at the Subject Premises, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10.    Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11.    Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12.    Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13.    Photographs or videos of the drug traffickers, their co-conspirators, and the property and assets purchased with drug proceeds.

14.    Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15.    Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons, as well as boxes, instruction manuals and other documentation for firearms and ammunition.

16.    Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear that may contain some or all of the records, information, and/or evidence described in Attachment B.

    a. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

    b. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

    c. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

    d. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

    e. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be

conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI shall deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### ATTACHMENT C - AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Michael Mosley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1490 1/2 6th S.t, Las Cruces, New Mexico ("NM") 88005, hereinafter "the Subject Premises," further described in Attachment A, for the things described in Attachment B.

1.  I am a Task Force Officer (TFO) with the Federal Bureau of Investigation and have been so since April 2023.  I am also currently an agent with the Las Cruces/Doña Ana County Metro Narcotics Agency (Metro Narcotics).  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  During my career as an FBI TFO, I have conducted numerous criminal investigations concerning violations of the Controlled Substances Act and have received ongoing training in conducting such investigations.  My experience as a narcotics agent includes, but is not limited to: conducting physical surveillance, interviewing witnesses, writing affidavits for and executing search warrants, working with undercover agents and informants, issuance of administrative and federal grand jury subpoenas, analysis of phone toll and financial records, and analysis of data derived from the use of pen registers, and trap and traces, and wiretaps.  Based on my

experience as a narcotics agent, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs, and to hide profits generated from those transactions. I also have experience in analyzing and interpreting coded dialogue and communications used by drug traffickers.

2.    I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically fentanyl, by Timothy Thomas Wilson. Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with the FBI, and law enforcement officials from other agencies have obtained information regarding the illegal drug trafficking activities of Timothy Thomas Wilson, and others (the "SUBJECTS").

3.    I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

    A.    Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the FBI and Metro Narcotics, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

    B.    Results of physical surveillance conducted by agents during the investigation;

    C.    Information derived from consensually recorded conversations;

    D.    A review of driver's license and automobile registration records;

    E.    Records from commercial databases; and

    F.    Records from the National Crime Information Center ("NCIC").

2

4.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

5.    I believe there is probable cause that the SUBJECT(S) have committed, are committing, and will continue to commit offenses involving violations of the following offenses (Target Offenses):

A.    21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances;

B.    21 U.S.C. § 846 – Conspiracy to distribute controlled substances;

C.    18 U.S.C. § 922(g) – Possession of a firearm and ammunition by a prohibited person; and

D.    18 U.S.C § 924(c) – Using/carrying a firearm in furtherance of a drug trafficking crime.

### EVIDENCE SOUGHT DURING SEARCH

6.    Based on my training, experience, and participation in this and in similar investigations, I know the information listed below.  I further know that drug traffickers often conceal the below described evidence of their drug trafficking in their residences and businesses, or in the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal such evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence of the types described below is also frequently found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried

3

underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

7.    Drug traffickers often maintain quantities of controlled substances.

8.    Drug traffickers commonly maintain and use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.

9.    Drug traffickers often maintain records of their transactions in a manner similar to the record-keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

10.   Drug traffickers often travel domestically and internationally to facilitate their trafficking.

Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. Many of these items are accessible via the internet and can be downloaded and saved on a computer or other digital media and on storage media.

11. Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This type of documentation can be stored on digital media and concealed virtually anywhere.

12. Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

13. Drug traffickers usually sell their product for cash. Because large quantities of drugs can

sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

14. Drug traffickers often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

15. Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration,

insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

16. The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

17. Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs

and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

18. Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

19. I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

20. Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

21. Drug traffickers often utilize digital video surveillance systems. A digital video surveillance

system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

22. Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

**COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

23. As described above and in Attachment B, this application seeks permission to search for

evidence and records that might be found on the PREMISES, in whatever form they are found.   Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media.   For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

24.    The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.   The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

25.    Necessity of seizing or copying entire computers or storage media.   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted

and/or storage media that reasonably appear that they may contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

31. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

32. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the

"home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

33.   If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

34.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

35.   As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained

13

within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

36. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

37. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for

law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

38. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## PROBABLE CAUSE

39. The following information is presented as probable cause to search the Subject Premises. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every known fact regarding the instant investigation. More specifically, I have set forth only pertinent facts that I believe are necessary to establish probable cause to search the Subject Premises for evidence of violations of the Target Offenses.

40. The FBI and the Las Cruces/Dona Ana County Metro Narcotics Agency (Metro Narcotics) are currently investigating a drug trafficking organization based out of Dona Ana County, NM. In April 2025, FBI and Metro Narcotics agents obtained information from a confidential source ("CS") that Timothy Thomas Wilson was currently involved in the

15

distribution of fentanyl and possibly other narcotics in Las Cruces, NM.

41. Information provided by the CS has historically been proven both reliable and credible. The CS has been corroborated through physical surveillance, law enforcement database checks, and controlled buy operations leading to evidence seizures. To agents' knowledge, no information provided by CS to date has been found to be false or misleading. The CS is cooperating with law enforcement in exchange for monetary compensation. The CS has a prior criminal history including charges for drug possession.

42. Through the course of the investigation, agents learned that Timothy Thomas Wilson currently resides at 1490 1/2 6th St, Las Cruces, NM (the Subject Premises).

43. In mid-April 2025, at the direction of agents, the CS arranged to purchase a distributable amount of fentanyl from Timothy Thomas Wilson. The CS met with Timothy Thomas Wilson at the Subject Premises and Timothy Thomas Wilson provided the CS with the suspected fentanyl in exchange for official government funds. Agents later tested the suspected fentanyl which did test presumptively positive for the presence of fentanyl. The following controlled-buy protocols were followed by agents for the transaction. During the transaction, CS observed several firearms inside the camper. One of the firearms was a black in color handgun that was within reach of Timothy Thomas Wilson on a table next to the flat screen TV. CS reported that he observed a rifle that he described as an AR-15 style rifle close to Timothy Thomas Wilson, underneath a bench. The following controlled-buy protocols were followed by agents for the transaction. During the transaction, CS observed a handgun that Timothy Thomas Wilson had in his possession that was not the same firearm previously observed. : 1) before the transaction agents met with the CS and searched the

16

CS's person contraband; 2) the CS was provided with official government funds for the controlled buy; 3) agents maintained physical and/or electronic surveillance of the CS during the buy; 4) after the buy, agents met with the CS and collected the evidence; and 5) after the buy, the CS's person was searched and agents debriefed the CS. No contraband was found on the CS's person during the pre- or post-buy searches.

44. In late April 2025, and on multiple occasions, the CS arranged to purchase a distributable amount of fentanyl from Timothy Thomas Wilson at the direction of agents. Each time the CS met with Timothy Thomas Wilson at the Subject Premises and Timothy Thomas Wilson provided the CS with suspected fentanyl in exchange for official government funds. The aforementioned controlled by procedures were conducted on each occasion.

45. For each controlled purchase of fentanyl, the CS communicated with Timothy Thomas Wilson via cellular telephone to arrange the deals.

46. Based on the foregoing, I believe that there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, 18 U.S.C. § 922(g), and 18 U.S.C. § 924(c) as more particularly described in Attachment B, will be found at the Subject Premises and on the person of Timothy Thomas Wilson.

47. Based on the foregoing, I believe that there is probable cause to believe that evidence of violations of the Target Offenses, as more particularly described in Attachment B, will be found at the Subject Premises and on the person of Timothy Thomas Wilson.

## CONCLUSION

48. I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

*M. Mosley*

Michael Mosley
Task Force Officer
Federal Bureau of Investigation

Electronically signed and telephonically
sworn on this 1st day of May, 2025:

GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE

18